# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

KRISTY L. ARSENAULT,

      Plaintiff,

    *vs.*

CAROLYN W. COLVIN,

      Defendant.

CAUSE NO.  1:14-cv-1481-SEB-DKL

## REPORT AND RECOMMENDATION

Plaintiff Kristy Arsenault brings this suit for judicial review of the defendant Commissioner's denial of her application for disability benefits.  The district judge referred this Cause to this magistrate judge for submission of a report and recommendation for disposition.  *Order Referring Issues to Magistrate Judge* [doc. 13].

## Standards

Judicial review of the Commissioner's factual findings is deferential:  courts must affirm if her findings are supported by substantial evidence in the record.  42 U.S.C. ▪ 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial review derives from the principle that

1

Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations.  Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.  Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.  While review of the Commissioner's factual findings is deferential, review of her legal conclusions is *de novo. Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).  20 C.F.R. §§ 404.1505, 404.1566, 416.905, and 416.966.  The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process.  42 U.S.C. ▪§ 423(d)(2)(B) and 1382c(a)(3)(G).  20 C.F.R. §§ 404.1523 and 416.923.

The Social Security Administration has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. If disability status can be determined at any step in the sequence, an application will not be reviewed further.  At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled.  At the second step, if the applicant's impairments are not severe, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Third, if the applicant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Part A, then the applicant is deemed disabled.  The Listing of Impairments are medical conditions defined by criteria that the Social Security Administration has pre-determined are disabling.  20 C.F.R. ▪ 404.1525.  If the applicant's impairments do not satisfy the criteria of a listing, then her residual functional capacity ("RFC") will be determined for the purposes of the next two steps.  RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations and is categorized as sedentary, light, medium, or heavy,

3

together with any additional non-exertional restrictions.   At the fourth step, if the applicant has the RFC to perform his past relevant work, then he is not disabled.   Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, the Commissioner determines if he can perform any other work that exists in significant numbers in the national economy.   42 U.S.C. ▪ 416.920(a)

  The burden rests on the applicant to prove satisfaction of steps one through four. The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy.   *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).   If an applicant has only exertional limitations that allow her to perform the full range of work at her assigned RFC level, then the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.   The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled.   If an applicant has non-exertional limitations or exertional limitations that limit the full range of employment opportunities at his assigned work level, then the grids may not be used to determine disability at that level.   Instead, a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics.   *Lee v.*

4

*Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may be used as an advisory guideline in such cases.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist.  If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts.  If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1]  An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision.  If the Appeals Council either affirms or declines to review the decision, then the applicant may file an action in district court for judicial review.  42 U.S.C. ▪ 405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

## Background

Ms. Arsenault applied for D.I.B. and S.S.I. benefits, and a period of disability, in June 2011, alleging that her disability began in May 2002.  Her claim was denied on initial,

---

[1] By agreement with the Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of state government, the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q (▪ 404.1601, *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

(R. 70, 71, 76-93), and reconsideration, (R. 72, 73, 95-108), reviews, in October 2011 and January 2012, respectively.  A hearing was held before an ALJ on June 5, 2013, during which a psychiatrist testified as a medical expert and a vocational expert testified.  (R. 23.)[2]  Ms. Arsenault was represented by current counsel at the hearing.  The ALJ issued his decision denying the claims in June 2013.  (R. 10, 18.)

Initially, the ALJ found that Ms. Arsenault met the insured-status requirements for benefits through December 31, 2007.  At step one of the sequential evaluation process, he found that she had not engaged in substantial gainful activity since her alleged disability-onset date.  He found that her work since that time as a waitress, caterer, and house cleaner did not amount to substantial gainful activity, but he also found that it "does show an ability to work."  (R. 13.)

At step two, the ALJ found that Ms. Arsenault had the severe impairments of bulimia, dysmenorrhea,[3] depression, anxiety disorder, and alcohol and drug-addiction disorders.  At step three, the ALJ found that Ms. Arsenault's impairments meet the criteria for Listings 12.04, for affective disorders, and 12.09, for substance addiction

---

[2] This was the full hearing on Ms. Arsenault's claims.  Two earlier brief hearings were continued for procedural reasons.  (R. 64, 56.)

[3] "Menstruation which is accompanied by pain; also, in a sense, difficult menstruation which is not necessarily accompanied by pain, as in cases of partial obstruction to the outflow of the blood.  Painful menstruation may be the result of spasm of the uterus, diseases of the vagina, formation of clots, inflammation of the tissues, etc.  In many cases the cause is unknown.  Emotional factors may be responsible."  J. E. Schmidt, *Attorneys' Dictionary of Medicine,* "dysmenorrhea" (2014) (available on Lexis at 2-D Attorneys' Dictionary of Medicine D-37890).

disorders.  He found that, when Ms. Arsenault was drinking alcohol and/or using controlled substances, she satisfied the "paragraph A" criteria of Listing 12.04 due to her insomnia and difficulty concentrating,[4] and the "paragraph B" criteria by having marked limitations in social functioning and maintaining concentration, persistence, or pace. (Satisfaction of both paragraphs A and B meets Listing 12.04).  Meeting Listing 12.04 also meets Listing 12.09:

> Behavioral changes or physical changes associated with the regular use of substances that affect the nervous system.
>
> The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied.
>
> *     *     *
>
> B.  Depressive syndrome.  Evaluate under Listing 12.04
>
> *     *     *

20 C.F.R. Part 404, Subpart P. Appendix 1, Part A, § 12.09.

The ALJ also found that, "[i]f the claimant stopped the substance use, the remaining limitations would not cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would not have a severe impairment or combination of impairments."  (R. 14, ¶ 10.)  He described that Ms. Arsenault alleges disability due to subjective symptoms of pain, fatigue, depression, and

---

[4] The ALJ might have found that she also experienced decreased energy, another factor included in Listing 12.04A1e.  He wrote: "I am persuaded and find that when the claimant was drinking alcohol and using marijuana, the 'paragraph A' criteria are satisfied for section 12.04 because the claimant had insomnia, difficulty concatrating [*sic*], dec. [*sic*]"  (R. 13, ¶9.)

anxiety which prevents performing full-time work and he found that, if and when she ceases the substance abuse, her impairments reasonably would be expected to produce the type of symptoms she alleges, but her statements about their intensity, persistence, and limited effects are not credible.  (R. 15.)  He listed fourteen "clear and convincing reasons" for finding her allegations of disabling limitations not credible to a disabling degree.  (R. 16.)  The seven reasons that clearly or possibly relate to Ms. Arsenault's dysmenorrhea impairment are:

- The claimant is not taking the type of pain medication associated with severe disabling pain.

- There is nothing in the record that supports the claimant's alleged level of limitation from her dysmenorrhea or her bulimia.

- There is no opinion of disability in the record.

- On January 5, 2011, the claimant stated that she was doing reasonably well on her current medication regimen.

- On January 7, 2011, the claimant stated that she was rarely drinking and she denied any controlled substance abuse.  She also stated that she cleans homes, caters and works as a waitress.  The claimant's treating record of December 17, 2012 is consistent with this record and also shows that the claimant has continued to work.

- The claimant is able to take care of her personal needs without assistance.  She does home chores.  She cooks and does laundry.  She goes out of the house alone.

- The claimant was capable of attending the hearing and participating in her own behalf.

(R. 16 (internal record citations omitted).)  The other seven reasons appear to be limited to her mental and substance-abuse impairments.  The ALJ provided no other analysis of Ms. Arsenault's dysmenorrhea or her symptom descriptions related thereto.

The ALJ then found that Ms. Arsenault's substance-use disorder "is a contributing factor material to the determination of disability because the claimant would not be disabled if she stopped the substance use," and, therefore, she is not disabled.  (R. 17.)  The Social Security Act provide that "[a]n individual shall not be considered to be disabled for purposes of the subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  Thus, the ALJ found Ms. Arsenault not disabled at step two, because she does not have a severe impairment, independent of the effects of her substance abuse.

The Appeals Council denied Ms. Arsenault's request to review the ALJ's decision, (R. 1), which rendered the ALJ's decision the final decision of the Commissioner on Ms. Arsenault's claims and the one that this Court reviews.

**Discussion**

Ms. Arsensault argues that substantial evidence does not support the ALJ's decision that she was not disabled due to her pain and chronic bleeding resulting from

dysmenorrhea and menorrhagia[5] for two reasons:  **(1)** he "ignored or rejected the evidence which proved that she was disabled;" specifically, "[t]he ALJ never mentioned any of the medical treatment evidence she received for Dysmenorrhea and Menorrhagia from 12-17-09 (R. 180-181) to 5-15-12 (R. 274-276)", (R. 11); and **(2)** he "and his medical advisor" erroneously and arbitrarily rejected Dr. Wooden's marked and extreme limitations of functioning, "simply because they were contrary to the ALJ's unqualified medical opinion," (R. 12).  Ms. Arsenault does not directly challenge the ALJ's findings regarding her mental impairments; his finding that her controlled-substance abuse is, or was, a contributing factor that is material to the determination of her disability; or his credibility finding.  Her ultimate argument is that the ALJ's step-two finding that her dysmenorrhea and menorrhagia impairments are not severe is not supported by substantial evidence and/or is the result of legal error.

    **1. Ignored evidence.**  The Commissioner concedes that the ALJ never mentioned or evaluated any of the medical-treatment evidence regarding Ms. Arsenault's dysmenorrhea and menorrhagia.  (*Defendant's Memorandum in Support of Commissioner's Decision* [doc. 24] ("*Response*"), at 3.)  Her argument is that the ALJ's error is harmless because, had he reviewed the treatment notes, he would have reached the same result —

---

    [5] Menorrhagia is "[m]enstruation in which the bloody discharge is very profuse."  *Attys' Dict. of Med.*, "menorrhagia" (available on Lexis at 4-M Attorneys' Dictionary of Medicine M-75017).  Although the ALJ did not explicitly find menorrhagia to be one of Ms. Arsenault's impairments, she argues it in her brief and the Commissioner also discusses it as one of her impairments.

that Ms. Arsenault's dysmenorrhea and menorrhagia are non-severe.   Thus, the Commissioner argues that Ms. Arsenault cannot show prejudice.  See *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010).   Because Ms. Arsenault surprisingly ignored the Commissioner's harmless-error analysis in her reply, the Court considers the Commissioner's argument on its own.

The Commissioner addressed five treatment notes from December 17, 2009 through May 15, 2012 and argues why they would not have changed the ALJ's finding that Ms. Arsenault's dysmenorrhea and menorrhagia were not severe impairments.

**December 17, 2009 Progress Note (R. 180-81).**  This is a primary-care office-visit note by Blaine Y. Takesue, M.D.  Dr. Takesue notes that Ms. Arsenault is "[h]ere for medicine refills."   The Commissioner argues that, although Dr. Takesue records Ms. Arsenault's complaints of "bad cramps" and her medical history of "[a]bnormal menstrual periods," "she had no acute reports and even reported that she planned to get a job."  (*Response*, at 4.)

Dr. Takesue did note "No acute problems," (R. 180), but his meaning is not clear. It reasonably could mean that Ms. Arsenault was not in severe distress or there was not a severe condition requiring immediate attention at the time of the visit, not that her

chronic conditions did not have severe symptoms or functional limitations.[6] Additionally, there is no detail about the type of job that Ms. Arsenault told Dr. Takesue that she planned to get — *e.g.,* part-time or full-time, or a job that would otherwise accommodate her dysmenorrhea and menorrhagia with breaks or additional days off each month.

**January 5, 2011 Progress Note (R. 260-62).**  This is a primary-care office note, of a "[r]outine visit/anxiety, depression, insomnia," by Rebecca L. Lindberg, M.D.  The Commissioner argues that this report would not change the the ALJ's decision because, although Ms. Arsenault reported a history of "metromenorrhagia[7] which has been evaluated by gynecology and reportedly related to very thick cervix," Ms. Arsenault "did not list it among one of her complaints at the appointment and Dr. Lindberg noted that Plaintiff 'tolerates' her two-week long heavy periods."  (*Response,* at 4 (citation omitted).)

It is unknown how the information is obtained for the "Chief Complaints" line of the Progress Note and its significance to the provider.  The report records that Ms.

---

[6] U. S. National Library of Medicine, MedlinePlus, "Acute vs. chronic conditions" (www.nlm.nih.gov/medlineplus/ency/imagepages/18126.htm) ("Acute conditions are severe and sudden in onset.  This could describe anything from a broken bone to an asthma attack.  A chronic condition, by contract is a long-developing syndrome, such as osteoporosis or asthma."); *Attys' Dict. of Med.,* "acute" (available on Lexis at 1-A Attorneys' Dictionary of Medicine A-2209) ("With reference to a disease, having sudden onset and a short, but rather severe, course as opposed to chronic, which designates a relatively slow onset and a protracted, but mild, course."

[7] Variant of menometrorrhagia, "[a]n abnormal bleeding from the uterus that is irregular in timing and excessive in quantity."  *Attys' Dict. of Med.,* "menometrorrhagia" (available on Lexis at 4-M Attorneys' Dictionary of Medicine M-74993).

Arsenault discussed her menstrual impairments with Dr. Lindberg, including that "she had very heavy painful periods," (R. 260), and "two week heavy painful menses every month," (R. 261), for which she takes three medications, (R. 260), and for which a hysterectomy had been recommended, (R. 260-61).  Ms. Arsenault evidently had an extensive discussion with Dr. Lindberg about these conditions and that they were substantial problems for her.  At most, the lack of inclusion of the impairments under "Chief Complaints" creates a discordance requiring further inquiry.  Dr. Lindberg's note that "Pt current tolerates the symptoms which consist of 2 weeks per every month which she has very heavy painful periods," (R. 260), is too indefinite.  What did she mean by "tolerates"?  Is her toleration consistent with the ability to perform substantial gainful activity?  This report does not convincingly show that the ALJ's decision would be the same if he evaluated it in comparison to the other evidence of record, including Ms. Arsenault's testimony, and articulated his conclusions.

**May 9, 2011 Progress Note (R. 185-86).**  This is a primary-care office-visit note, again by Dr. Takesue.  The visit was a "routine followup," (R. 185), and she presented for medication refills, (R. 185-86).  The Commissioner argues that, although Ms. Arsenault reported to Dr. Takesue that her medications were not helping with her menstrual cramps, he wrote that she did not present with any "acute medical complaints." (*Response*, at 4-5.)  For the same reasons given above, the absence of "acute" complaints

13

does not indicate that her dysmenorrhea and menorrhagia are not severe and do not cause significant functional limitations.

**August 11, 2011 gynecological evaluation (R. 236-37), August 11, 2011 gynecological office-visit note (R. 240), and August 26, 2011 hospital history and physical note (R. 239).** Apparently these reports are records of a gynecological-clinic office visit, an admission for testing, and a follow-up visit for a pap smear and endometrial biopsy. The Commissioner argues that, while Ms. Arsenault "complained of heavy periods and pain, her pap smear and biopsy were normal." (*Response,* at 5 (citation omitted).) Because a pap smear[8] and endometrial biopsy[9] are not tests for dysmenorrhea or menorrhagia, but are often performed to rule out cancer and other causes for abnormal bleeding,[10] normal results on these tests tend to support, not detract from, diagnoses of dysmenorrhea and menorrhagia, and certainly indicate nothing about the degree of symptoms experienced as a result of either. As argued by the

---

[8] A pap smear is "[a] commonly used test for the detection of cancer of the uterus and the cervix." *Attys' Dict. of Med.* "Papanicolaou smear test" (available on Lexis at 4-P Attorneys' Dictionary of Medicine P-88750).

[9] An endometrial biopsy is a biopsy performed on the inner lining of the uterus for the evaluation of abnormal uterine bleeding, screening for lining cancer, and evaluation for uterine abnormalities. *Attys' Dict. of Med.* "endometrial biopsy" and "endometrial biopsy, uses of" (available on Lexis at 2-E *Attys' Dict. of Med.* E-40425 and E-40428).

[10] Merck Manual, Professional Version, "Dysfunctional Uterine Bleeding (DUB)", available at http://www.merckmanuals.com/professional/gynecology-and-obstetrics/menstrual-abnormalities/dysfunctional-uterine-bleeding-(dub) (last visited Jan. 26, 2016).

Commissioner, these reports do not tend to show that Ms. Arsenault's dysmenorrhea and menorrhagia are not severe impairments.

**November 7, 2011 and May 15, 2012 Progress Notes (R. 263-68, 274-76).** These are notes of two primary-care office visits with Dr. Takesue, both described as routine and for medication refills. The Commissioner argues that, while they record a past medical history of abnormal menstrual periods, she presented with "no medical complaints." (*Response*, at 5.) However, Dr. Takesue was well-aware of her dysmenorrhea and menorrhagia and both reports record that these conditions were still a problems for her: during the November 2011 visit, Ms. Aresnault reports that she is soon to have surgery "to help with her abdominal cramps" and, during the the May 2012 visit, she reported that she is still considering the hysterectomy. In addition, the May 2012 report notes only that she "has no acute complaints at this time," not that she has "no medical complaints" or does not continue to experience pain and discomfort from her dysmenorrhea and menorrhagia. It is not reasonable to expect Ms. Arsenault to repeat, at each routine visit, a litany of her symptoms and their severity. These reports do not convincingly show that a remand would produce the same result.

Ms. Arsenault testified to quite severe symptoms and functional limitations resulting from her dysmenorrhea and menorrhagia, (R. 38-45, 48-51), which, if true, the vocational expert testified would render her unable to sustain any competitive employment, (R. 53). The ALJ did not address or evaluate any evidence related to these

15

impairments.  He concluded they are severe impairments, but only when Ms. Arsenault is experiencing alcoholism and/or drug addiction, yet he did not explain or cite any evidence of a relationship between alcoholism or drug addiction and symptoms of dysmenorrhea or menorrhagia.  The ALJ failed to undertake a credibility analysis of her symptom and functional-limitations statements related to dysmenorrhea and menorrhagia, independent of her alcohol and substance addiction, and failed to make any finding thereon.  As noted above, he wrote only that "[t]here is nothing in the record that supports the claimant's alleged level of limitation from her dysmenorrhea . . . ," which is only conclusory; no support or explanation was given.

The medical expert, Dr. Sherman, a psychiatrist, testified only that, when Ms. Arsenault is abusing alcohol and drugs, she meets mental listings 12.04 and 12.09 and that there is no evidence that she meets a mental listing when she is not using.  (R. 32-33.) She testified that it is impossible to tease out the effects of the substance abuse in order to make a judgment about other mental disorders, such as bipolar disorder.  (R. 36.)  She did not testify regarding satisfaction of any other, non-mental, listing.  Neither did she offer any opinion on Ms. Arsenault's dysmenorrhea or menorrhagia, the credibility of her symptoms or resulting functional limitations, or the conditions' relationship with her mental disorders.  (As a psychiatrist, the question would arise how much weight any such opinions should be accorded.)  In short, there has been no articulated and supported expert or lay evaluation of Ms. Arsenault's dysmenorrhea or menorrhagia.

16

The Commissioner has not shown that these errors were harmless.

**2.    Rejection of treating-examining physicians' functional findings.**    Ms. Arsenault argues that "[t]he ALJ erroneously rejected the treating-examining physicians' functional findings simply because they were contrary to the ALJ's unqualified medical opinion, requiring reversal of the denial decision.  Thus, the ALJ and his medical advisor arbitrarily rejected the Marked and Extreme limitations of functioning determined by Dr. Wooden PhD in his evaluation for Social Security."  (R. 12 (case and record citations omitted).)  The only "functional findings" identified by Ms. Arsenault that the ALJ and the testifying medical expert, psychiatrist Miriam Sherman, M.D., ignored are the "marked" and "extreme" limitations found by Dr. Howard Wooden.

Dr. Wooden performed a mental-status consultative examination of Ms. Arsenault on request of the state agency and recorded his findings and conclusions in a "Medical Source Statement of Ability To Do Work-related Activities (Mental)" (a Social Security form), (R. 224-26), and in his own narrative report, (R. 227-30).  On the form, he opined that Ms. Arsenault had "marked" restrictions in the work-related functional categories of (1) carrying out complex instructions, (2) the ability to make judgments on complex work-related decisions, (R. 224), and (3) interacting appropriately with co-workers, (R. 225).  He found that she had extreme restrictions in (1) interacting appropriately with co-workers and (2) responding appropriately to usual work situations and to change in a routine work setting.  (R. 225.)   the functional areas of social functioning and maintaining

concentration, persistence, and pace, which satisfied the "paragraph B" criteria of the mental listings.

The ALJ accorded Dr. Wooden's report "more than moderate weight, as it is detailed and contains objective evidence," but he accorded it "less weight" than he gave to the opinion of Dr. Sherman, the medical expert, because he found that she reviewed the entire record and "her explanations of the discounting of [Dr. Wooden's diagnosed] bipolar disorder are persuasive and are based on her years of experience in the field." (R. 14.) The ALJ discussed Dr. Wooden's report, (R. 13, 14), and Dr. Sherman's and his own critiques of his opinions, (R. 14). The ALJ gave Dr. Sherman's opinions "very great weight," (R. 14, 16), and adopted them.

There is no support for Ms. Arsenault's contention that the ALJ rejected Dr. Wooden's opinions "because they were contrary to the ALJ's unqualified medical opinion" — he more-heavily weighted and relied on Dr. Sherman's opinions — or that the ALJ and Dr. Sherman "arbitrarily rejected" Dr. Wooden's "marked" and "extreme" limitations — both the ALJ and Dr. Sherman articulated their reasons in the record and the ALJ found that the Dr. Wooden's found mental limitations were rendered moot by the fact that Ms. Arsenault's alcoholism and addiction were contributing factors that are material to the determination of her mental disability.

Ms. Arsenault has not shown error.

18

## Recommendation

The Commissioner's denial of Ms. Arsenault's claims for disability benefits should be reversed and remanded, with instructions to evaluate Ms. Arsenault's dysmenorrhea and menorrhagia and to articulate findings and conclusions as to whether those conditions are disabling.

## Notice regarding objections

Within fourteen days after being served with a copy of this recommendation, either party may serve and file specific written objections thereto. 28 U.S.C. ▪ 636(b); Fed. R. Civ. P. 72(b)(2). A district judge shall make a *de novo* determination of those portions of the recommendation to which objections are made. 28 U.S.C. ▪ 636(b); Fed. R. Civ. P. 72(b)(3).  Failure to file an objection might result in forfeiture of the right to de novo determination by a district judge and to review by the court of appeals of any portion of the recommendation to which an objection was not filed. *Tumminaro v. Astrue,* 671 F.3d 629, 633 (7th Cir. 2011); *United States v. Pineda-Buenaventura,* 622 F.3d 761, 777 (7th Cir. 2010); *Schur v. L. A. Weight Loss Centers, Inc.,* 577 F.3d 752, 761 n. 7 (7th Cir. 2009); *Kruger v. Apfel,* 214 F.3d 784, 787 (7th Cir. 2000); *Johnson v. Zema Systems Corp.,* 170 F.3d 734, 739 (7th Cir. 1999).

**DONE this date:**  01/28/2016

*Denise K. LaRue*

Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.